Filed 5/16/25  In re Thomas C. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Thomas C., a Person Coming Under the Juvenile Court Law. | B340890<br><br>(Los Angeles County Super. Ct. No. 21LJJP00036A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>C.C.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Donald A. Buddle, Jr., Judge.  Affirmed.

Jesse Frederic Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

———————————————

Caitlin C. (mother) appeals from a juvenile court order terminating her parental rights.  Her son, Thomas, became a dependent of the juvenile court as a result of mother's ongoing and unresolved substance abuse.  Mother repeatedly relapsed on drugs and failed to reunify with Thomas.  Thomas was in foster care for over three and a half years before the matter proceeded to a hearing to select a permanent plan.  Thomas's foster parents wanted to adopt him.  Mother argued that the parental benefit exception to adoption applied.  The juvenile court found mother had not maintained regular visitation and contact with Thomas, but also found Thomas had a substantial, emotional attachment to mother and that he would benefit from continuing the relationship.  However, the court ultimately concluded mother failed to establish that the termination of parental rights would be detrimental to Thomas.  We affirm the juvenile court order.

**FACTUAL AND PROCEDURAL BACKGROUND**

From 2016 to 2018, Thomas was a dependent of the juvenile court due to mother's substance abuse.  Mother completed a case plan and dependency jurisdiction was terminated.

In December 2020, then five-year-old Thomas again came to the attention of the Los Angeles County Department of Children and Family Services (DCFS).  DCFS received referrals suggesting mother had treated Thomas roughly while in public and she did not seem "mentally stable."  During an investigation, mother tested positive for methamphetamine, amphetamine, and marijuana.  The juvenile court detained Thomas from the parents

2

and eventually sustained a petition based on mother's ongoing substance abuse.[1]  In March 2021, the court removed Thomas from mother and ordered family reunification services.

### *Initial Reunification Period*

By mid-May 2021, mother had completed an inpatient drug treatment program.  But in mid-June 2021, mother was discharged from an intensive outpatient program after she did not attend required group meetings, missed drug tests, and asked to withdraw from the program.  In July and August 2021, mother tested positive for methamphetamine, amphetamine, and marijuana.

While in the inpatient program, mother "was very involved with . . . Thomas" and "called and video chatted with [him] almost every night."  After mother completed the inpatient program, however, she attended only three of 12 in-person visits scheduled between June and August 2021.  Mother also had weekly 30-minute video chats scheduled with Thomas.  According to the caregiver, mother often called late or missed the video visits.  When the video visits did occur, mother was "engaged" and talked to Thomas "about school, his toys, and trucks."

Thomas was diagnosed with fetal alcohol spectrum disorder and was assessed for Regional Center services.  A medical examination form reported: "[Foster mother] is doing a remarkable job of working with Thomas.  In the absence of [a professional assessment] and intervention program, she has worked diligently with Thomas and great progress has been made.  This child has [a] combination of [likely]

---

[1]     Father's whereabouts were unknown to DCFS and the juvenile court for most of the dependency proceedings.  He died in 2023.

3

neurodevelopmental issues due to . . . serious prenatal exposures to alcohol and meth and as many as four and a half years of . . . serious neglect in the care of his mother. [Foster mother] has provided him with a warm, stable, structured and encouraging environment that is simply exemplary."

At the September 2021 six-month review hearing, the court continued mother's reunification services. Over the next six months, mother was repeatedly discharged from treatment programs and tested positive for methamphetamine, amphetamine, and marijuana. Between late June 2021 and mid-January 2022, mother attended 15 of 28 scheduled in-person visits with Thomas. One of those visits was cut short because mother appeared to be under the influence. Two visits were canceled because either Thomas or the monitor was ill. Mother missed the remaining 11 visits.

The reports summarizing mother's visits were positive. The monitor described Thomas running to mother when she arrived at the visits, hugging her, kissing her, playing with her, and having a good time. On one occasion in September 2021, Thomas did not want to leave at the end of the visit. On another occasion, Thomas "screamed [with] joy to see mother" when she unexpectedly arrived at a visit with the maternal grandmother. Thomas and mother said they loved each other and held each other. Thomas was excited and happy to see mother.

By this time, Thomas was in a new foster placement and was receiving services for autism. A Regional Center report indicated Thomas had visits scheduled with mother once a week for two to three hours and daily telephone calls. However, the foster mother reported that mother missed visits and phone calls.

At the April 25, 2022 12-month review hearing, the juvenile court terminated mother's reunification services and set a permanency planning hearing pursuant to Welfare and Institutions Code section 366.26 for August 2022.[2]

### *Permanency Planning Period*

In the August 2022 section 366.26 report, the foster parents reported their concern that Thomas had "difficulty regulating, especially after visitation and that he makes up stories that they are certain are not true." They told a social worker that Thomas had difficulty sleeping and was frequently afraid there were monsters under his bed. Occasionally he played with fecal matter and smeared it on the walls, explaining that it was a monster he had to crush and smear so that it would not return.

Since the last report, mother had 27 visits scheduled. Ten of the visits could not take place because mother, Thomas, or the visit monitor was ill, in quarantine due to COVID-19, or Thomas and the foster parents were away. At another 10 of the visits, only the maternal grandmother was present. Mother attended the seven remaining visits. The report acknowledged that mother missed some visits due to restrictions at her treatment facilities. The report further acknowledged that Thomas looked forward to the visits and that, when mother did visit, she was loving and attentive.

However, the foster parents told the social worker that when Thomas returned home from visits he was sometimes "very angry" and upset because mother would promise to take Thomas with her but failed to follow through. They reported Thomas expressing anger towards mother after a recent visit, saying:

---

[2]     All further statutory references are to the Welfare and Institutions Code.

5

" 'She told me I was going home with her today.  She lied to me.  She hates me.  Everyone hates me.' "  Thomas then ripped the head off a teddy bear mother had given him.  Thomas was so upset that the foster parents contacted his therapist for an emergency session, which lasted two hours until Thomas was "able to better regulate his mood."  More generally, the foster parents observed that Thomas was "often out of sorts for a couple days and is kind of stand offish and distant" after visits with mother.

DCFS informed the court that Thomas's foster parents were interested in adopting him.  Thomas had been placed with them since January 2022.  Thomas had adjusted to the foster home and said he liked living with the foster parents.  A social worker observed that he appeared comfortable and was bonding with the foster father.

When a social worker interviewed the now seven-year-old Thomas, he "expressed confusion over going home to his biological family vs staying with his current family.  The child calls the caregivers Mom and Dad and states 'They are real good people.  Real good.  I miss my (bio) Mom but I love this Mom too.  I want to stay here but I want to go home too.' "  According to the foster parents, when Thomas learned that they were adopting another child in the home, and that child's last name would be changed to the foster parents' last name, Thomas asked if he could have that name too.

The section 366.26 hearing was continued to November 2022.  In a November section 366.26 addendum report, the foster parents reported that Thomas was receiving counseling "because he needs a lot of help with learning to cope and dealing with his anger issues."  He also continued receiving Regional Center

6

services.  Asked about the foster parents, Thomas said: " 'My mom, I love her so much.  She's nice to me.  She feeds me, she lets me go outside and play.  My dad, I love him too.  Yes, I want my mom and dad to take care of me until I'm grown up.  They keep me safe.' "

The section 366.26 hearing was continued to January 2023, then again to February 2023.  In a further supplemental section 366.26 report filed in February 2023, DCFS reported that mother was having telephone or virtual visits every night.  However, mother repeatedly called outside of the arranged time for the visits, including when Thomas was getting ready for school or after he was asleep.  A social worker "reported [that] due to the child's psychological and emotional needs, structure is important in helping the child maintain emotional stability."  The virtual/telephone visit schedule was therefore changed to every Friday, Saturday, and Sunday.  Although the visits were scheduled to last one hour, they typically lasted only around 20 minutes because of Thomas's short attention span.  The foster mother reported that she frequently had to "remind the mother not to make promises to the child as he becomes very dysregulated and upset when the mother does not follow through."  On one phone call, mother put a man on the line who was "someone from her meetings."  The man "made a promise to Thomas that he could not keep."  Thomas "was angry, tore out the frame of his window and made holes in the walls" at the foster home.  The visitation monitor told mother the man should not have been talking to Thomas.

Twenty-eight in-person visits had been scheduled since the last detailed report to the court.  Mother attended 17 of the visits.  Seven of the visits could not take place due to Thomas, mother, or

the visit monitor being ill or in COVID-19 quarantine, or Thomas was unavailable. Two visits did not take place because mother failed to confirm in advance. The maternal grandmother attended three visits without mother, including on one of the occasions that mother was ill. However, the visitation monitor reported that mother almost never canceled a visit. The monitor further indicated that mother was loving and attentive with Thomas and played well with him.

The social worker for the case reported that mother and Thomas were bonded and had a loving and affectionate relationship. They frequently shared a secret saying that meant "I love you" at the end of visits. Yet, the social worker also reported that Thomas had significant special needs and "participated in a high level of services" that included weekly therapy, wraparound services, and twice daily medication. Mother's unfulfilled promises to Thomas that he would be going home to live with her were "difficult for [him] to process." While Thomas was usually in a good mood both before and after visits, he became dysregulated if mother disappointed him by not following through on her promises that he could return home with her. In such situations, the foster mother "redirected the child and distracted him with an outing to bring balance back to his emotional state."

The social worker was also concerned that mother had not demonstrated any new skills or behaviors that would allow her to meet Thomas's "significant needs." Mother continued to struggle with substance abuse and had been discharged from multiple treatment programs. Although Thomas talked about "going home" to mother, the social worker reported that "this happens mostly when it is time for another visit."

DCFS reported that Thomas and the foster parents—now the prospective adoptive parents—had developed a strong bond. The social worker found "the prospective adoptive parents to be attentive to Thomas'[s] high needs and that they have found effective strategies for managing [his] behaviors and [anger] after he is disappointed by his mother." DCFS opined that Thomas's attachment to the caregivers "has allowed Thomas to feel loved, safe, secure and connected emotionally."

### *Further Reunification Services*

In November 2022, mother had filed a petition pursuant to section 388, asking the court to return Thomas to her custody or to reinstate reunification services. Mother reported that she planned to complete her programs by the end of the month, had tested negative, and was "continu[ing] her sobriety." Mother said she was visiting Thomas every Saturday and had telephone or virtual visits every day. DCFS opposed mother's request, noting that she had just been asked to leave another substance abuse program. At a February 2023 hearing, mother testified that she had completed a substance abuse program, had mental health services scheduled, and she had completed individual counseling and a parenting class. The juvenile court granted mother's petition and ordered further reunification services.

In late February and early March 2023, mother twice attempted to take Thomas out of school without permission. On the second attempt, school security escorted mother off campus. In an August 2023 report, DCFS informed the court that after mother's section 388 petition was granted, the social worker had to remind mother not to speak to Thomas about going home and not to introduce her male companions to Thomas because "it triggers the minor's behaviors." According to Thomas's therapist,

9

Thomas had expressed the feeling: "If 'my mommy can be with her friends why can't she be with me.' " DCFS opined that mother's mental health prevented her from grasping what she was told, and she needed weekly reminders. DCFS reported that in December 2022, after mother "began to visit" Thomas, his "behaviors went from aggressive to toys and objects to aggressive towards people."

Thomas was taking medication for ADHD, but he "has hurt animals when angry, has broken [iPads], broken the room in his wall [*sic*] from banging his second iPad, and spreads feces on walls when upset. The caregiver . . . makes sure the minor takes his medication daily and makes sure that he makes all his therapeutic appointments."

Mother tested negative for drugs until July 2023, when she had a positive test for methamphetamine. Mother denied using drugs. She claimed that the positive test must have been the result of touching methamphetamine at a friend's house.

Because of mother's positive test, DCFS did not switch mother to having unmonitored visits. Mother had weekly in-person monitored visits and telephone calls three days each week. DCFS reported: "[Thomas] is excited to see [mother]. When CSW arrives to pick up [Thomas] for visits, [he] instantly states, 'We are going to see my mom . . . but I'll be back to my momma [caregiver] right?' " Mother was "loving and affectionate" with Thomas.

In September 2023, the juvenile court terminated mother's reunification services and set a new date for the section 366.26 hearing in November 2023.

***Further Permanency Planning***

In a November 2023 section 366.26 report, the foster parents reported that Thomas was "very needy," but they were assisting him in receiving behavioral and mental health services. Thomas had been in their home for nearly two years and they still wanted to adopt him.

The report summarized prior reports about mother's visits. In addition, the foster mother reported that Thomas had visits with the maternal grandmother and "he anxiously waits for these visits by the door." The adoptions social worker observed Thomas standing by the door, "waiting for the monitor to pick him up for his visit." According to the foster mother, after the weekly visits with mother, Thomas became depressed, then violent. He would break things, "punch people and say mean things after his visits."

Thomas, now eight years old, told the adoptions social worker he had " 'everything he needs, has a roof over his head, a place to sleep, and a backyard to play soccer in.' " He said that although he " 'love[d] it' " at the foster parents' home, he wanted to "go back with his family."

In November 2023, the section 366.26 hearing was continued to December. Mother filed another section 388 petition, asking for reinstatement of her reunification services. Mother contended that she had completed an inpatient substance abuse program, had remained sober, and continued to try to visit Thomas regularly. The petition asserted that both Thomas and mother had special needs, and Thomas's acting out behavior after visits with mother demonstrated their strong bond.

The December section 366.26 hearing was continued to March 2024.

In March 2024, DCFS reported that Thomas was "well bonded" to the foster mother and they had a loving relationship. The foster mother reported that when a visit was canceled with mother, Thomas tended to "go backwards," get upset, and break things. In mid-February 2024, mother did not show up for a visit. Thomas was upset when he returned home and broke a vase. The foster mother further reported that mother's visits were "triggering" for Thomas and their telephone calls seemed "forced." The foster mother opined that during the telephone visits, Thomas "acts more like the parent and mother more like the child."

A March 2024 supplemental section 366.26 report summarized mother's visits in the 2023 calendar year. According to the report, mother attended 6 visits alone and 26 visits with the maternal grandmother. As in past reports, DCFS informed the court that mother was loving towards Thomas during visits. Thomas looked forward to visits and cried when they were canceled. The longtime visitation monitor noted that mother needed coaching about basic parenting skills, "such as limiting phone time during visits and limiting sweets and snacks before meals." There was also concern that mother blurted out difficult information—such as news of the deaths of father and the maternal grandfather—without any recognition of Thomas's "developmental considerations." Mother sporadically called Thomas on Fridays. According to the foster mother, the calls were usually short, and mother would tell Thomas she was calling because the maternal grandmother told her to. Mother seldom asked Thomas how he was doing. Instead, Thomas asked mother questions, such as whether she was eating or suggesting that she drink more water.

The report provided an analysis of the factors necessary to determine whether the parental benefit exception to adoption would apply. DCFS opined that there was a significant positive emotional attachment between mother and Thomas, that Thomas would benefit from continuing his relationship with his biological family, and that he would experience "a high amount of loss" if visits with mother and the maternal grandmother were terminated. Nonetheless, DCFS opined that adoption would create a new sense of stability for Thomas over time and that it was the most beneficial permanent plan. Although DCFS therefore recommended that the juvenile court terminate parental rights, it also noted it was "equally clear" that Thomas looked forward to visits with his family and "the visits are essential to the child's positive self-image." DCFS suggested it was in Thomas's best interest for the court to refer the matter for a post-adoption contact agreement.

DCFS interviewed Thomas for a separate response to mother's section 388 petition. Thomas told a social worker he called the foster parents "mom" and "dad." He also called mother his "mom." He was aware that he had a visit with mother the day of the interview and would be picked up soon for the visit. He told the social worker that visits with mother made him happy. Without prompting, Thomas volunteered: " 'I want to go back with mom. I miss them so much. . . . I miss her so much. I want to play with her every day. She makes me happy.' " When asked with whom he would want to live if he could not return to mother, Thomas answered, " 'I would like to stay here [with the foster parents] but I *want* to go to mom.' " When asked again about his wishes if living with mother was not an option, Thomas said he would want to visit mother. The social worker asked how

13

he would feel if he was not able to see mother. He responded, " 'I would feel really sad. I really want to be with her.' "

The visitation monitor indicated mother's visits were consistent and she rarely missed a visit unless she was in treatment or there were unforeseen circumstances. Thomas anticipated and looked forward to visits. When asked what she thought would happen if Thomas stopped seeing mother, the monitor said she did not know. She explained: "[I]t is a hard situation because he looks forward to the visits but he also worries about mother so there is some anticipation on his part every week." She recounted that she had recently told Thomas they could only wait for 15 minutes after the scheduled visit time for mother and the maternal grandmother to arrive. When mother and the maternal grandmother were late after that, Thomas watched the clock until 15 minutes had passed, then said it was time to leave. He cried, "but seemed to accept the situation."

The foster mother opined that mother's commitment to the visits and telephone calls was influenced by the maternal grandmother who told her to attend and to make the calls. The foster mother felt that Thomas acted like a parent during the calls with mother. She further observed that Thomas acted out after mother disappointed him. She said "mother doesn't seem to see how she hurts him when she doesn't answer the phone, arrives late for a visit or blurts out bad news."

According to the foster mother, Thomas looked forward to coming home after a visit with mother and did not talk about her or say he wanted to see her on any day other than the scheduled weekly visit day. She believed Thomas's "eagerness for the visit is actually the 'routine' of visiting his mother and the worry that

14

comes with it because he doesn't do well with change." The foster mother believed Thomas's focus on visiting was not necessarily because of his attachment to mother, but was due to his need to have things go as planned. The foster mother also opined that mother had not grown or improved, she continued to relapse, and she kept "making the same mistakes that end up hurting" Thomas.

DCFS concluded Thomas would be at high risk of future abuse or neglect in mother's care and recommended that the juvenile court deny mother's section 388 petition. In March 2024, the juvenile court denied the petition. The section 366.26 hearing was continued to July 2024.

In a July 2024 supplemental section 366.26 report, DCFS informed the court that the foster parents still wanted to adopt now nine-year-old Thomas, they were not interested in pursuing legal guardianship, and they wanted a closed adoption. The foster mother believed that "constant contact" was not beneficial for Thomas. She opined that mother had a negative impact on him. When a social worker commented that the court would like to continue Thomas's visits with mother and the maternal grandmother because there was a bond between them, the foster mother responded: " 'There is no bond. [Thomas] is autistic and this is just routine for him.' "

According to the foster mother, when the longtime visitation monitor told Thomas that he would be having his last visit with mother, Thomas was "fine" and had no reaction. The foster mother also reported that mother displayed "odd behavior" during her telephone calls with Thomas and inappropriately discussed case information with him. In a later conversation, the foster mother told a social worker that she believed Thomas's

visits with mother were detrimental to him.  She repeated that there was no bond between Thomas and mother and asserted that mother went weeks without calling him.  Mother had not had a visit with Thomas since April 2024, after DCFS stopped providing a monitor for the visits.

In an update on recent visitation, DCFS reported that mother missed two visits in April 2024 because she was reportedly ill.  Only the maternal grandmother visited.  On Thomas's birthday in mid-May, mother attempted to call Thomas three times during the day, while he was at school.  When Thomas got home, he called mother, who said she would call him back.  She did not.  When Thomas called her again later, mother answered the phone, said, " 'I'm smoking,' " and hung up.  DCFS continued to recommend termination of parental rights.

In early June 2024, the foster mother reported that mother and the maternal grandmother showed up at the church the foster parents and Thomas attended.  Mother "threw a fit and was crying and yelling and was asked to leave."

In July 2024, one of the social workers told the foster mother that DCFS was concerned that Thomas's mental health might be negatively affected after the adoption was finalized because a closed adoption would cut off all contact with his biological family.  The foster mother subsequently agreed that Thomas could call mother and the maternal grandmother on birthdays—theirs and his—and that he could ask for permission to call them at other times.  The foster mother said she was comfortable with Thomas having contact with his biological family after the adoption was finalized, so long as the contact was "child led."

### *Section 366.26 Hearing*

Thomas testified at the July 2024 section 366.26 hearing. He explained that he calls the foster parents "mother" and "father" and he likes living with them because they "mean a lot" to him. When asked if the social worker or his therapist had explained to him that the judge had to make a decision about where he would live and whether he would keep having visits with mother, Thomas answered: "Yes. And I do want to still have visits. [¶] . . . [¶] Because I want to spend more time with my mom and my grandma. [¶] . . . [¶] They just mean a lot to me. That's why." He said he would be sad if the judge said he could not see them anymore. He testified that if it were up to him, he would live with his own family. He explained: "Because I really miss my own family. If there is one thing I'm still sad about, it's about my grandpa because something made me sad about him, like he died." He testified that he talked to mother on the phone "sometimes, not that much." After his testimony, Thomas sat in mother's lap with his face buried in her neck. According to Thomas's counsel, he was crying.

A social worker who had serviced the case for two years also testified. She indicated she had no concern about the effect the termination of parental rights would have on Thomas's physical or emotional well-being. She did not believe it would have any effect "[b]ased on the fact that we have arranged for a level of visitation after, that is pretty much in line with what's been going on, I think he'll—he won't notice the difference." When asked if she would have concerns about terminating parental rights if she knew Thomas's visits would not continue, the social worker answered: "Yes. That's why I called for myself and worked it out for myself."

The social worker opined that permanently severing relations between Thomas and his family would have a detrimental effect on him. But when asked specifically about severing the relationship with mother, the social worker testified: "I can't predict the future, but Thomas is bonded to his family, to people, not just his mom." She had observed that when Thomas saw his mother that morning at the courthouse, he ran up to her and gave her a hug. However, when he saw the foster mother arrive in her car to pick him up from court, "he ran to her, said 'Mommy' and gave her a big hug." His actions were nearly identical with both women. The social worker testified that Thomas received benefits from being in the foster parents' home, namely "consistent love, safety, the stability of a sober parent, the reliability that comes with having a sober parent, who is ready and willing to be present."

During the arguments of counsel, the juvenile court indicated that it was "assuming that if the court goes along with the Department's recommendation to terminate parental rights, the court is assuming that [Thomas] will no longer see his mother." The court found Thomas credible, except for his perception of time. The court also found the foster mother credible "for the most part," noting that her statements were corroborated by parties who were either independent or did not have a bias or motive to lie. The court disagreed with the foster mother's assessment that Thomas and mother did not have a bond. But the court also noted that the foster mother had been caring for Thomas since January 2022, and "she is frankly in a better position to know what makes [Thomas] tick than the court."

The court reviewed the reports of mother's visitation and concluded she had attended around 57 percent of her visits from June 2021 through December 2023. The court noted mother missed all of her scheduled visits in June 2021, most of July 2021, and half of August 2021. She missed all of her visits in January, March, June, and July 2022. She did not consistently begin visiting Thomas until January 2023. The court rejected the visitation monitor's statement that mother's visitation was consistent. Although mother's visits became more regular throughout 2023 and "possibly 2024," the court found mother had not shown consistent visitation.

Despite that finding, the court considered the other elements of the parental benefit exception to adoption. The court found Thomas has a "substantial, emotional attachment to mother and that he would benefit from continuing the relationship."

To evaluate detriment, the court considered that the foster parents had cared for Thomas through his challenging behaviors, ensuring that he received services, and, because of their care, Thomas had adjusted well. The court noted instances when the foster mother had helped Thomas "restore his emotional balance after a disappointing visit with his mother." The court acknowledged that "the caregiver's ability to regulate [Thomas] after visits may differ from guiding him from the complete termination . . . of his relationship with his mother and grandmother for that matter . . . ." However, the past incidents suggested to the court that the foster mother could provide support in the future and Thomas could manage disappointment. The court also noted the improvement in Thomas's behavioral issues. It attributed "his immense progress to the care and

19

stability provided by his caregivers and expect[ed] that it will continue even if his mother's parental rights are terminated." The court reasoned that Thomas has a strong bond with the caregivers and he spoke highly about the entire foster family.

The court thus concluded: "Considering the care and stability the caregivers have provided for Thomas and [mother's] inconsistent ability to set healthy boundaries, her ongoing issues with substance abuse, and issues with considering [Thomas's] developmental issues, which previously negatively impacted [Thomas], terminating her parental rights would not be detrimental to Thomas, weighing against permanency and stability that he will gain from adoption. [¶] Although the record indicates terminating parental rights will lead to emotional instability, sadness, or acting out as it has in the past when [mother] made different promises, the court believes [Thomas's] progress in his different services along with caregiver's ability to support him through challenges will help him overcome any negative impact of terminating his mother's parental rights. Thus mother has failed to establish the parental bond exception exists and not meeting the third prong as termination of relationship with [Thomas] is not detrimental weighed against balance of having stability of adoptive home with [the foster parents] who [are] bonded to him and his needs, including tending to his challenging behaviors and ensuring he receives services required, like therapy."

The court found no exception to adoption applied and terminated parental rights. Mother timely appealed.

# DISCUSSION

## I.     The Parental Benefit Exception to Adoption

Once the juvenile court has terminated family reunification services, the focus of the case shifts from reuniting the child with a parent to providing the child with a permanent, stable placement.  (*In re S.G.* (2024) 100 Cal.App.5th 1298, 1313.)  At the section 366.26 hearing, if the court finds by clear and convincing evidence that the child is likely to be adopted, the court must terminate parental rights to allow for adoption, unless the parent establishes that termination would be detrimental to the child for one of several reasons set forth in section 366.26, subdivision (c).  (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' [Citation.]" (*Id.* at p. 631.)

Mother contends the juvenile court here erred by failing to apply the parental benefit exception.  Under section 366.26, subdivision (c)(1)(B)(i), the juvenile court may choose a permanent plan other than adoption when it finds termination of parental rights would be detrimental to the child because the parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.

In *Caden C.*, *supra*, 11 Cal.5th at page 636, our high court explained that a "parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial,

21

positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."

We review the first two elements for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The [juvenile court's factual] determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the . . . court might have reached a different result had it believed other evidence.' " (*Id*. at p. 640.) We review the third element for abuse of discretion. We will find an abuse of discretion "only when ' " 'the . . . court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.]" (*Id*. at p. 641.)

## II. The Juvenile Court Did Not Err in Concluding the Parental Benefit Exception Did not Apply

### A. Regular visitation and contact

Mother contends the evidence was insufficient to support the juvenile court's finding that mother did not show regular visitation and contact with Thomas. Mother relies on several DCFS reports which, starting in August 2022, indicated mother visited and contacted Thomas regularly. However, mother ignores that the juvenile court explained that it had looked at the number of visit opportunities and independently analyzed whether mother's visitation was regular and consistent, omitting times when visits could not take place due to illness or other

similar circumstances. Based on that independent analysis, the court rejected at least some of the reports' summary statements that mother consistently visited. Indeed, the court pointed out that mother missed all of her visits in four months of 2022 and did not begin to visit consistently until 2023. (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1070–1071 [record supported finding that father failed to show regular visitation where he missed nearly 40 percent of all visits during two-year period after reunification services were terminated and had significant gaps in visitation].)

Mother suggests it is unclear if the court was taking into account telephone or other virtual visits. Yet, a September 2021 report indicated that mother routinely missed telephone visits and, as of March 2024, mother called only sporadically.

Thus, while the evidence may have been in conflict, there was substantial evidence to support the juvenile court's finding that mother's visitation and contact with Thomas was not regular. We need not affirm on this ground alone, however. Despite finding a lack of regular visitation and contact, the juvenile court continued to assess the other two elements of the parental benefit exception. The court found mother established that Thomas has a substantial, positive, emotional attachment to her. We therefore turn to the third element.

B. Detriment

The juvenile court determined that mother did not show that terminating Thomas's attachment to her would be detrimental even when balanced against the benefit of a new adoptive home. We find no abuse of discretion.

The juvenile court acknowledged that terminating parental rights would lead to Thomas experiencing "emotional instability, sadness, or acting out." Yet, the court also considered that

23

Thomas, with the assistance of the foster parents, had been able to manage difficult feelings related to mother in the past and to regain emotional balance. The court recognized that the disappointment arising from mother not following through on a promise to take him home would differ in magnitude from the loss Thomas would experience from the termination of parental rights. Still, the trial court reasonably interpreted the evidence as suggesting "that the caregiver can provide support and that [Thomas] can manage disappointment."

Moreover, while the juvenile court did not credit the foster mother's opinion that there was no bond between Thomas and mother, it found the foster mother's other statements credible. Indeed, as the juvenile court reasoned, the foster mother was Thomas's primary and daily caregiver. She observed that while Thomas anticipated visits and talked about mother on visit days, he did not mention mother on other days. Further, the foster mother reported that when the visitation monitor told Thomas in April 2024 that he was going to have his last visit with mother, Thomas "was fine and had no reaction." The foster mother additionally observed that mother's contacts with Thomas were sometimes negative. Mother disappointed him by making promises she could not keep, missed calls, told Thomas she was calling because the maternal grandmother told her to, and blurted out bad news in a way that hurt Thomas.

As the juvenile court noted, the foster mother's observations were corroborated by other evidence. A DCFS report from August 2022 recounted that mother told Thomas she would take him home, leading him to react violently and state the mother hated him and "everyone" hated him. DCFS social workers noted mother had to be reminded repeatedly not to share

24

inappropriate information with Thomas during visits, not to make promises she could not keep, and not to simply "blurt out bad news."

In addition, the foster mother's observation that Thomas's commitment to visits with mother was based on his desire for routine, more than his attachment to mother, had at least some support in the record. In a February 2023 report, DCFS informed the court that although Thomas talked about going home to mother, it mostly happened on the days of his visits. This was consistent with the foster mother's statements that Thomas did not talk about mother at times other than visit days. The visitation monitor also indicated that when, for example, a visit did not take place because mother was too late, Thomas cried, but was able to accept the situation. While there was evidence that Thomas eagerly anticipated visits with mother, there was little evidence that he had difficulty separating from mother at the end of visits. At one point, DCFS reported that when the visitation monitor picked him up for visits, Thomas confirmed both that he would be visiting mother, but also that he would be returning home to the foster parents. Indeed, even when opining that Thomas would experience a "high amount of loss" if visits with the mother and maternal grandmother ceased, DCFS explained: "The child seems to respond well to his weekly routine, which includes visitation. It is the [Department's] assessment that keeping his current routine as stable as possible will be a valuable component to the child's emotional stability."

The juvenile court also appropriately considered the significant benefits Thomas would receive in a new adoptive home. The court noted Thomas had graduated from wraparound services, he made immense progress which the court reasonably

attributed to the caregivers' stability and care, and the evidence established Thomas had developed a strong bond with the caregivers. These findings were supported by the evidence.

Further, Thomas's own statements and testimony illustrated the benefits of the safety and security he stood to receive in a new adoptive home. He called the caregivers "mom" and "dad," explained that he loved them, said he had everything he needed in their home, and testified that they mean a lot to him. A permanent plan short of adoption would risk removing that sense of security and safety. Indeed, the foster parents indicated they did not wish to pursue legal guardianship, suggesting the possibility that Thomas would have to be moved to a new placement if the juvenile court selected a permanent plan other than adoption, or that he would face prolonged uncertainty in foster care.

In *Caden C.*, the court recognized that "understanding the harm associated with severing the [parent-child] relationship is a subtle enterprise—sometimes depending on more than just how beneficial the relationship is. . . . Sometimes . . . a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

This was such a case. Thomas and mother have a loving relationship that, even if not always positive, is one that Thomas does not want to lose. Yet, there was also evidence that the relationship is to some degree destabilizing for Thomas and that the benefits of placement in a new, adoptive home are extremely significant. We cannot conclude that " ' " 'under all the evidence, viewed most favorably in support of the trial court's action, no

26

judge could reasonably have made the order that he [or she] did.' " ' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

In support of her argument on appeal, mother cites the evidence of Thomas's love for mother; his statements that she made him happy, that he wanted to be with her, and that he wanted to continue visiting her and would be sad if he could not. However, the trial court recognized and acknowledged the emotional attachment between Thomas and mother. The existence of that relationship—illustrated by Thomas's statements that he wanted to continue visiting, that mother made him happy, and that he missed her—did not eliminate the need for the juvenile court to weigh the harm of losing that relationship against the benefits of placement in a new, adoptive home.

Mother also points to Thomas's negative behaviors that occurred after visits with mother as evidence that terminating parental rights would be detrimental. Mother argues these negative behaviors were "indicative of [Thomas's] strong feelings towards his mother" and "the solution to this concern is not to fully sever the relationship."

We note that the record did not lend itself to only one interpretation of Thomas's negative behaviors after visits with mother. Mother appears to assert that Thomas engaged in negative behavior after visits with mother because he was separated from her. The foster mother, on the other hand, opined that mother simply had a negative impact on Thomas and visits caused him to decompensate, even if they were positive at the time. Further, there was evidence that it was mother's negative behaviors that prompted at least some of Thomas's responsive negative conduct, such as mother missing visits, arriving late, or

promising that he could return home with her. To the extent the juvenile court considered Thomas's acting out behavior after visits as an indication that severing the relationship with mother would have some benefit to Thomas, we can find no abuse of discretion. (See *Caden C.*, *supra*, 11 Cal.5th at p. 635 [a trial court might find that "terminating a relationship with negative aspects would have some positive effects that weigh in the balance—and may tip it in favor of severing the parental relationship to make way for adoption"].)

Mother additionally relies on the DCFS opinion that Thomas would experience significant loss if visits with mother and the maternal grandmother ceased, and the social worker's testimony that severing Thomas's relationship with mother and the maternal family would have a detrimental effect on him. Undoubtedly the opinions of the DCFS social workers who serviced the case were important for the court to consider.[3] However, the application of the parental benefit exception to adoption required more than a finding that severing the

---

[3] We note that while DCFS opined that severing the relationship would cause Thomas a "high amount of loss," the agency also believed that adoption would give him a new sense of stability and was in his best interest. We further note that both DCFS and the testifying social worker failed to distinguish between Thomas's bond with mother and his bond with the maternal grandmother, asserting the harm would flow from the termination of the relationship with both. The juvenile court could not base its decision about the applicability of the parental benefit exception on Thomas's relationship with the maternal grandmother. (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 817 [juvenile court erred in applying parental benefit exception based on child's relationship with members of the biological family other than the parents].)

relationship with mother would cause Thomas harm. The juvenile court understood that Thomas would suffer harm from the termination of parental rights. But mother was additionally required to establish that the harm Thomas would suffer would outweigh "the security and the sense of belonging a new family would confer." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Whether the termination of parental rights would be "detrimental" to Thomas, in the legal sense of that word, was for the juvenile court alone to decide.

Finally, mother contends the juvenile court considered inappropriate factors when assessing whether the parental benefit exception applied. The record does not support this contention.[4] Mother asserts there was no basis for the juvenile court to conclude the foster mother could provide support to Thomas in dealing with the loss of the relationship with mother. Yet, the juvenile court could properly extrapolate from the foster parents' past support provided to Thomas in dealing with difficult situations, even if they were of lesser magnitude than the termination of parental rights. Further, we disagree with mother's contention that the foster parents' contributions to Thomas's care were irrelevant to the exception. The juvenile court appropriately considered the benefits Thomas had already reaped from a safe, secure, and supportive environment, when weighing the harm he would suffer from the termination of

---

[4] Mother argues at length that *DCFS's* opinions considered improper factors, such as post-adoption contact and mother's inability to meet Thomas's needs. Yet, the juvenile court did not adopt DCFS's opinions as its own. Instead, it conducted its own evaluation of the evidence. That DCFS may have relied on or discussed improper factors does not invalidate the juvenile court's independent decision.

parental rights against the benefits to be gained from a new, adoptive home.

Mother additionally argues the juvenile court should have rejected the foster mother's opinions and observations and asserts the court inaccurately assessed the strength of the relationship between Thomas and the foster parents. On appeal, we do not reweigh the evidence or second guess the factfinder's credibility determinations. The record provides no basis for this court to conclude the juvenile court should have rejected the foster mother's statements in their entirety. Moreover, as noted above, the record supported the juvenile court's conclusion that Thomas has a strong bond with the caregivers. We disagree with mother's argument that Thomas's bond with his foster parents was irrelevant. On the contrary, whether Thomas had developed other family-like attachments was highly relevant to what his life would be like in an adoptive home without mother in his life. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

The juvenile court's reference to mother's inability to set healthy boundaries and her ongoing issues with substance abuse was also appropriate. As mother acknowledges, the *Caden C.* court reasoned that a parent's struggles with issues that led to the dependency may be relevant to the extent they inform the question of whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it[.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 638.) Here, there was evidence that mother's inability to set healthy boundaries repeatedly led to hurtful interactions between mother and Thomas during visits, contributing to his emotional instability when he returned to the foster home or after a virtual visit was over. The same was true of mother's continued struggles with substance abuse. Mother's

ongoing substance abuse prevented her from having the regularity in visits that, given Thomas's need for stable routines, was critical to his emotional well-being. The juvenile court properly considered these factors when attempting to "disentangl[e] the consequences of removing those burdens along with the benefits of the relationship." (*Id*. at p. 634.)

The juvenile court's decision was well supported by the evidence before it. Even if other inferences could be drawn from the evidence, that alone does not authorize this court to interfere. The juvenile court's decision was not arbitrary, capricious, or patently absurd. We affirm the juvenile court order.

## DISPOSITION

The juvenile court order is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.